### ARKANSAS NATURAL GAS CO. v. CONSUMERS' GAS CO.

(Circuit Court of Appeals, Eighth Circuit. April 7, 1920.)

No. 5471.

1. Gas ⊙⟼13(3)—Contract to furnish cannot be avoided because unprofitable.

In the absence of a statute providing for the regulation of contracts of public utilities by a commission, a gas company contracting to furnish gas to another company's customers for specified percentages of the selling price cannot avoid the contract, because it is or becomes unprofitable, unless such right is conferred by the contract itself.

⊙⟼For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**2. Gas ⊜13(3)—Contract to furnish held not to authorize avoidance, because unprofitable from increased cost of operation.**

Where a producer of natural gas contracted to furnish gas to another company's customers for specified percentages of the selling price, over which it was given no control, a provision that it agreed from time to time, by drilling and developing its territory and acquiring and developing additional territory reasonably tributary, to endeavor to the best of its ability and so long as it might be reasonably profitable to furnish an adequate supply of gas, etc., applied only to conditions of supply, and not to conditions of operation apart from the acquisition and development of sources of supply, and did not authorize the avoidance of the contract because unprofitable from increased cost of production, transportation, and maintenance, where its wells had not failed and the cost of procuring a supply of gas had not become prohibitive.

Appeal from the District Court of the United States for the Eastern District of Arkansas; Jacob Trieber, Judge.

Suit by the Consumers' Gas Company against the Arkansas Natural Gas Company. From a decree for complainant, defendant appeals. Affirmed.

W. B. Smith, of Little Rock, Ark. (John M. Moore, J. Merrick Moore, and H. M. Trieber, all of Little Rock, Ark., on the brief), for appellant.

W. H. Martin, of Hot Springs, Ark. (E. H. Wootton and T. K. Martin, both of Hot Springs, Ark., on the brief), for appellee.

Before SANBORN and CARLAND, Circuit Judges, and VAN VALKENBURGH, District Judge.

VAN VALKENBURGH, District Judge. On January 30, 1911, the Hot Springs Gas Company, an Arkansas corporation, entered into a contract with appellant whereby it was agreed that said appellant should sell and deliver to consumers of gas in the said city of Hot Springs, Ark., by means of the plant and equipment then owned by the said Hot Springs Gas Company, all natural gas that might be required by the consumers thereof in said city of Hot Springs for a period of 20 years thereafter not to exceed, however, a total amount of 8,000,-000 feet per day for said term, or during any day of said term. The prices and terms governing the sale of natural gas to consumers is set forth in paragraph 13 of this contract, together with the basis of division between the parties thereto of the sums received therefor. By this schedule the appellant was to receive certain named percentages of the selling price to consumers, which were fixed and established by the contract. Appellant was given no control over the rates to be charged to consumers, but the Hot Springs Company reserved the right to lower or alter said rates; the proportion to appellant remaining the same. Protection to appellant, however, was preserved by the terms of section 14 of the contract, by which it was provided that:

"In the event the Hot Springs Company shall sell natural gas at rates lower than those fixed in the said schedule, then the proportion due the said Arkansas Company shall be based on such lower rates, and it is further provided, however, that the said Arkansas Company, if dissatisfied with the proportion it will receive on the basis of such lower rates, may thereupon

terminate this agreement after 6 months' notice in writing, of its intention so to do, unless the said Hot Springs Company. before the expiration of the 6 months' notice, restores the division of proceeds collected, based upon the rates named in said schedule, or such other notice as may be otherwise agreed upon."

Later the Hot Springs Gas Company conveyed and assigned all of its rights under said contract to the Consumers' Gas Company, appellee herein, which assumed all of the obligations of the Hot Springs Gas Company as contained in said contract. After said contract had been in effect for nearly 7 years appellant demanded of appellee that it increase its rates to consumers of gas. This demand was refused, whereupon, on December 4, 1917, appellant served appellee with written notice to the effect that it would, after January 1, 1918, refuse to supply appellee, or its consumers, with gas, and discontinue its supply to appellee on that date. Thereupon appellee brought its bill against appellant, praying that appellant be permanently enjoined from requiring the appellee to raise the price of gas in accordance with the demands of appellant, and that it also be permanently enjoined from discontinuing the supply of natural gas to plaintiff under said contract. It also prayed temporary relief pendente lite not material to this discussion.

The suit filed originally in the state court was subsequently removed to the District Court of the United States for the Western Division of the Eastern District of Arkansas, because of diversity of citizenship, and there appellant duly filed its answer. Appellee at once moved the court to strike out those parts of the answer which assumed to set up the matters of defense upon which appellant relies, upon the ground that such paragraphs contained erroneous constructions of the contract between the parties, disclosed no defense to the bill of complaint, and because the facts therein alleged were otherwise irrelevant to the issues tendered. This motion was sustained by the trial court, and, the appellant electing to stand upon its answer and declining to plead further, a decree was entered in accordance with the prayer of the bill.

Inasmuch as the paragraphs stricken from the answer contained the entire substance of appellant's defense to the bill, it will be necessary to set them out in full.

"Defendant denies that the prices and terms covering the sale of natural gas to consumers is fully set forth and fixed in paragraph 13 of said contract. On the contrary, the schedule of net rates is set out in said paragraph merely for the purpose of establishing a basis for the division of gross receipts between the parties to the said contract, and it was as a basis of division only that it was stipulated in the succeeding paragraph that said schedule of rates should be in force for the full term of said contract; the intention and purpose of said provision being that the basis established by the figures set out in said paragraph should be in force during the full term of the contract, and not the rates assessed against consumers.

"Defendant alleges that in said contract it agreed and undertook that it would during the term of the contract, by drilling and developing its then present gas territory, and by acquiring and developing additional territory reasonably tributary to that then owned or controlled by it, endeavor to the best of its ability, and so long as it might be reasonably profitable to it, to furnish and provide a supply of natural gas to the Hot Springs Company in sufficient volume to meet the requirements of its consumers, within the limits

set out in said contract. And defendant avers that its undertaking was conditional upon its being able to procure and deliver gas at a reasonable profit to be realized by it above the cost of production and transportation. On that behalf defendant further alleges: That the wells from which it contracted to supply gas to furnish the plaintiff are situated in the state of Louisiana, an average distance of ———— miles from the city of Hot Springs, and all gas delivered under said contract has to be transported that distance. That the life of gas wells is, and was at the time said contract was executed known to be, very uncertain, and it was impossible for the parties to said contract to know how long the wells used in the production of natural gas might remain productive. That the cost of acquiring land for sinking wells and the machinery necessary to be used in producing gas and transporting it from the gas field to the city of Hot Springs is very great and requires a very large investment of capital. That the cost of maintaining the pipe lines and pumping stations necessary to be maintained in transporting natural gas and of operating said lines was and is very large, owing to the fact that the mobility and natural flow of gas is easily and very largely affected by changes in the weather, while the pipe line is exposed to a great variety of accidents, that frequently interfere with and interrupt its use and involve large expenditures in the way of extraordinary and unusual repairs; and on account of the large investment, the great expense of maintenance and operation, and the uncertainty of the duration of the plant and business by reason of the falling off of the supply, the business and investment was known to the parties to said contract to be extremely hazardous, and it was for that reason that the undertaking of the defendant to supply natural gas during the term of the contract was conditioned that it should be able to do so at a reasonable profit in view of the uncertainty and the risk incident to the business, and in that behalf the defendant avers that the cost of production and transportation of natural gas has materially increased since said contract was entered into.

"Defendant further alleges that the average life of productive wells is from 10 to 12 years. Constant exploration, testing, and boring for new wells is necessary in order to maintain a natural gas plant in operating condition. The opening and preparing of new wells for operation and the testing of unproductive wells involves large expense, and there is also a heavy loss growing out of the abandonment of exhausted wells, by reason of the fact that a great deal of costly machinery used in natural gas plants becomes practically valueless when the property is abandoned. On account of the great risk and hazard involved in the business, investors in securities on natural gas property require them to run short periods to maturity, and it is necessary to provide for the rapid retirement of the principal, either by the creation of a large sinking fund or by annual payments.

"Defendant alleges: That it has invested in its wells, pipe line, and plant the sum of $6,000,000. That it has operated said plant for a period of 7 years, and prior to the year 1917 its business, after paying operating expenses, taxes and interest charges, showed a deficit of approximately $20,-000. It supplies many small cities and towns along its main pipe line with natural gas, including the city of Little Rock, which is the largest city, and consumes a very much larger quantity of natural gas than any other city or station, on its line. In the year 1917 a military encampment was established at said city, at which there was assembled a large number of soldiers, whereby the population of said city and vicinity was very largely augmented, which resulted in a very large increase in the consumption of gas in said city. That in the year 1916 the rates charged by defendant for natural gas were increased at all points on its line, except at the city of Hot Springs, and by reason thereof, and the increase in the population and the consumption of natural gas in the city of Little Rock in the year 1917, as aforesaid, the gross and net earnings of defendant's business were increased, so that its net earnings for said year were $119,023.85, after paying cost of operation, taxes, and allowing for depreciation.

"Defendant alleges that it has outstanding $2,615,000 of bonds, and that it has never earned enough to enable it to pay any dividend on its stock, or more than interest at the rate of 6 per cent. per annum on its said bonds.

"It alleges that the city of Hot Springs is 22 miles from defendant's main pipe line, and in order to supply it with natural gas it was necessary to construct and maintain a branch line of that length, which increases the expense of transporting and delivering natural gas at said city over points along its main line, while the rate collected by defendant per thousand cubic feet for gas used for domestic purposes is not as large as at other points, and the same is true as to gas used for industrial purposes.

"Defendant alleges that it does not and has never realized a reasonable profit on the gas delivered to plaintiff under said contract.

"Wherefore it is advised and avers that it is not obligated under the provisions of said contract to continue to supply plaintiff with natural gas, and it prays that the injunction issued in this cause be dissolved and plaintiff's bill dismissed."

[1] It must be conceded at the outset that the reasons assigned by appellant for departing from the terms of the contract, as originally entered into, embrace none of the excuses for nonperformance recognized by the law of contracts. In a proper case public service commissions may deal with questions of this nature and afford relief, because, when such commissions, with enumerated powers, are in existence when the contract is made, the public service law, containing the powers of such commissions, is read into the contract; but in the absence of such, as in the case at bar, individuals or corporations may not arbitrarily avoid contracts into which they have entered and courts may not permit them to do so. Unless, then, the right is conferred by the contract itself, appellant must be held to the terms of its agreement. This is substantially conceded by appellant, which points to paragraph 7 of the contract as authority for its action. This paragraph reads as follows:

"The Arkansas Company agrees that, during the term of this contract, it will, from time to time, by drilling and developing its present gas territory, and by acquiring and drilling and developing additional territory reasonably tributary to its present plant, endeavor to the best of its ability, and so long as it may be reasonably profitable, to furnish and provide an adequate supply of natural gas to the Hot Springs Company, in sufficient volume to meet the requirements of its consumers; that is to say, in the quantity or quantities hereinbefore set forth. That such drilling and developing shall be done in the manner usually followed by gas companies in conducting the natural gas business; but this covenant is made with the full knowledge, by the Hot Springs Company, of the risk and hazard of drilling for and obtaining gas, and no liability is assumed by the Arkansas Company for failure to furnish an adequate supply of gas after reasonable effort has been made to do so by the Arkansas Company, as above provided."

[2] Appellant contends that this paragraph requires it to furnish gas only so long as it may be reasonably profitable so to do under the provisions of its contract. We do not think this paragraph is susceptible of that interpretation. We think it was never intended to permit the Arkansas Natural Gas Company to avoid the contract merely because its performance became unprofitable in the ordinary sense. The rates were fixed so far as appellant was concerned. If it had been intended to permit it also to bring about a raising or lowering of the local rates to consumers, obviously that would have been provided for by reservation as explicit as that made in behalf of the Hot Springs Company. This section is a familiar one in natural gas contracts between producer and distributor. The supply

of natural gas is known to be elusive and uncertain. No company would undertake to supply a given volume of this commodity under any and all circumstances. Paragraph 7 deals exclusively with the acquisition, drilling, and developing of gas territory, and the words "reasonably profitable" apply obviously only to conditions of supply, and not to conditions of operation under the contract, apart from the acquisition, development, and maintenance of sources of supply. To hold otherwise would be to say that the contract was of no binding effect from the outset.

Indeed, appellant in its answer avers that it was the understanding of parties:

"That its undertaking was conditional upon its being able to procure and deliver gas at a reasonable profit to be realized by it above the cost of production and transportation," and "that it does not and has never realized a reasonable profit on the gas delivered to plaintiff under said contract."

This is equivalent to saying that, having entered into this contract advisedly and with a full understanding of the conditions then existing, it was not bound thereby from the very outset. Such a contention cannot be entertained. We are dealing here with a contract between corporations, unaffected by the conditions which attach to public utilities subject to the control and supervision of the state through public service commissions. This contract differs in no respect from any contract made between individuals for the furnishing of specific commodities, in specific quantities, at a future date, without regard to fluctuations in the market or in the cost of production. If physical conditions applicable to this peculiar commodity had subsequently made it impossible to procure a supply except at prohibitive cost, inhering in the very uncertainty and perhaps remoteness of the sources of supply, a different question would be presented, because preserved in the contract itself; but that question is not in this case.

By the very paragraphs of its answer which were stricken out appellant concedes:

"That the wells from which it contracted to supply gas to furnish the plaintiff are situated in the state of Louisiana, an average distance of —— miles from the city of Hot Springs, and all gas delivered under said contract has to be transported that distance."

These wells were there when the contract was made, and are there now. It is then alleged that the life of such wells is now, and was then, known to be uncertain; but it does not appear that they have since failed. It is averred that the cost of acquiring land for sinking wells, and the machinery necessary to be used in producing gas and transporting it from the field to the city of Hot Springs, is very great and requires a large investment of capital; that the cost of maintaining the pipe lines and pumping stations necessary to be maintained in transporting natural gas and of operating said lines was and is very large for various stated reasons, all of which was well known at the time the contract was made. In short, all the facts and circumstances set up as grounds for avoiding this contract must have been within the knowledge and contemplation of the par-

ties at the time the contract was made, or involve the familiar increase in cost of production, transportation, and maintenance, against which no provision was made by the terms of the agreement between the contracting parties. The courts cannot make new contracts for litigants, nor relieve them from the legal effects of their own improvident undertakings.

The action of the trial court was right in striking from appellant's answer the offending paragraphs and in entering a decree in favor of the complainant below. Its action is accordingly affirmed.

